United States District Court
Western District of Texas
Austin Division

| | |
|---|---|
| United States of America<br><br>v.<br><br>Raymond Luke Garner,<br>    Defendant. | No. 1:23-CR-156 (RP) |

## Government's Sentencing Memorandum

On August 9, 2023, luck was all that saved unsuspecting members of the public from grievous injury and defendant Raymond Luke Garner from charges for causing serious bodily injury or even death. Garner had parked his truck at the garage of St. David's Hospital in Austin on his way to visit an ailing relative. He brought a pipe bomb with him that detonated in his truck, necessitating a massive law enforcement response and stoking fears that someone had tried to bomb one of the busiest medical facilities in the Austin area. The government has not uncovered evidence that Garner intended to detonate a device or attack anyone. But the Court should not consider this a mere one-off accident. Rather, it was the culmination of months of dangerous behavior. Garner was on probation at the time of the offense and nonetheless experimented with extraordinarily dangerous explosives and destructive devices. And when he was caught, he placed another individual in danger in an effort to conceal evidence, going so far as to lull her into thinking the items he asked her to move were safe. Garner gambled with his life and the safety of others. In light of his history and the seriousness of his conduct, a sentence within the Guidelines range of 30-37 months' imprisonment would be an appropriate and just punishment.

## Background

On August 9, 2023, a pipe bomb in the back of Garner's truck exploded while the truck was parked in the garage at St. David's Hospital in Austin. The explosion thankfully did not cause injuries or damage to the garage. Police officers located Garner shortly after and he identified nothing more than a gas can that could have caused the explosion. While he was detained,

Garner sent text messages to a loved one to ask her to move a box of evidence from his home and hide it.  That individual asked Garner whether the box was safe, and he reassured her that it was.  Garner failed to tell her that, among other things, the box contained a quantity of the high-explosive hexamethylene triperoxide diamine (HMTD), which is highly volatile and sensitive to heat, shock, and friction.  He had her move that box from his home in a relatively rural location to an urban apartment complex.  The safe handling of the box and its contents required the evacuation of her apartment and neighboring apartments.  Evidence found at Garner's home included a recipe for HMTD, circuit boards/timers, remote control devices that could be used for remote detonation, a toolbox with a circuit board attached and pieces of metal within, more pipe and end caps, and a significant number of firearms.  Within Garner's truck, investigators found more circuit boards/timers, electric matches, a homemade firearm, and small quantities of narcotics.  A search of Garner's storage unit revealed, among other things, illegal silencers/suppressors, ammunition, pipe and end caps, and timers.

Garner researched how to make explosives and destructive devices and knew what he was doing.  He had a recipe for HMTD in his home.  He used a military field manual on improvised explosive devices to learn how to construct the devices.  There was evidence that he had experimented with different kinds of destructive devices.  Garner had circuit boards, timers, and remote detonation devices.  And at his home, he had a toolbox with a circuit board attached that also contained metal washers, metal plates, and other objects that could have been shrapnel. On his electronic devices, investigators found video preview images for a YouTube channel called Ordinance Lab.  It is unclear which of these videos Garner actually viewed.  But some of the video titles included "Exploding Mail Boxes," "Improvised Thermobaric Bombs," "Re-usable Molotov Cocktails," "How to Set Off Explosives" (the picture shows the presenter holding a pipe bomb), "Body Armor vs. Explosives," "3D Printed Explosive Charges," "Explosive Collar" (with a yellow cord-shaped object tied around the neck of a dummy), "Tremors Pipe Bombs," and "Ordinance Lab Presents: Legality of Destructive Devices." In the last video, the presenters described National Firearms Act registration requirements.

**Garner Sentencing Memorandum** 2

It is particularly alarming that Garner had many of these items in his home, including (before he asked that it be moved) a box with a quantity of HMTD.  As noted in the PSR, Garner shares custody of a young child.  Had the HMTD in his home been activated, it could have easily put his child in grave danger.

This was not Garner's first brush with law enforcement for related conduct. In March 2023, he was sentenced to eight months' probation for unlawful carrying of a weapon.  When he was arrested, Garner was in possession of, among other things, a firearm, an illegal suppressor, and a homemade "rocket candy" firework.  Defendant was under supervision when he was arrested in this case.

On October 2, 2023, Garner pled guilty to Count One of the Indictment, which charged him with possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d).  The government intends to move to dismiss Counts Two and Three of the Indictment at sentencing.

## Discussion

A sentence within the Guidelines range of imprisonment of 30-37 months would meet the goals of § 3553(a), accounting for the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to promote respect for the law and deter criminal conduct.  Garner has already received his second chance when he received probation for state offenses and a substantial term in federal prison is required to demonstrate that his dangerous conduct is unacceptable.

First, the defendant's conduct posed an unacceptable risk of injury to innocent third parties. Garner carried a pipe bomb in his truck and parked in the garage of one of the busiest medical facilities in the region.  The explosion of the device led to a significant law enforcement response and substantial inconvenience to others who attempted to access the hospital.  To the extent the explosion was an accident and not an intended attack, Garner's activity before and after the explosion demonstrates that he put himself and those closest to him in serious danger.

Garner manufactured dangerous explosives and stored them in his home even though he shared custody of a small child.  He experimented with various types of devices and ways of

detonating them. He appears to have detonated them primarily in a remote location on his parents' property. He thus knew the destructive power of the devices and yet he worked to improve his designs. Garner may argue that mere curiosity run amok explains his behavior. But the Court should not ignore the fact that he experimented with a tool case full of shrapnel, remote detonators, and timing devices. These are all the hallmarks of increasingly deadly and concealable weapons. Perhaps Garner had no extant plans to use the devices against people or property, but he was certainly developing the knowledge and skills that would have made him exceedingly dangerous should his life, mental health, or addictions taken a darker turn. The danger was only compounded by his extensive drug use, including methamphetamine addiction.

After he was caught, Garner placed another loved one in danger when he asked her to move a box that contained HMTD from his home to her apartment. Despite being asked directly, Garner lulled her into thinking the box was safe. His instinct for self-preservation was so strong he placed yet another loved one at risk. The Court's sentence should account for the serious of the offense and his conduct both before and after the explosion.

Second, Garner received and threw away a golden opportunity to reform himself. When he was arrested in Marble Falls in 2021, Garner had marijuana, multiple firearms and illegal suppressors, and a "rocket candy" firework in a Styrofoam cup with a fuse attached. Concerned about the device, the Austin Bomb Squad had to respond to what should have been a routine traffic stop. The substance in the "rocket candy" was not explosive and was characterized as incendiary. Despite the seriousness of the offense and possession of illegal suppressors, Garner was given probation in March 2023. Garner was not deterred and appears to have seen the Court's leniency as a mere inconvenience. He chose to immerse himself in a toxic combination of drugs, an obsession with explosives, and a penchant for firearms (including homemade firearms with no serial number).

Garner's behavior was only escalating and becoming more dangerous before August 9, 2023. Sadly, even the need to provide for his daughter or tend to his own health did not sufficiently encourage him to obey the law. A substantial sentence is required to drive home the message that

**Garner Sentencing Memorandum**                                                                                                                          4

that his conduct is unacceptable and will be met with correspondingly more serious punishments. The Court should not simply take him at his word that he is or can be rehabilitated.

Finally, Garner has already received leniency in this case and additional leniency would be a windfall. As set forth in the factual basis section of the plea agreement and the PSR, Garner obstructed justice when he asked his loved one to move and conceal crucial evidence. The PSR correctly notes that he should receive a two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Normally, this enhancement would render him ineligible for a downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 App. Note 4 ("Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."). However, in the plea agreement, the government agreed not to oppose Garner receiving full acceptance of responsibility credit. Application Note 4 to Guidelines § 3E1.1 further provides: "There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." *Id.* Here, Garner debriefed with the government shortly after his arrest and provided information allaying serious law enforcement concerns about ongoing threats to public safety, including concerns about ongoing attack planning or ideologically-motivated violence. The government thus made a fact-specific determination that Garner should receive acceptance of responsibility credit. Without this agreement, the applicable Guidelines range could have been 41-51 months' imprisonment. Garner should receive no more leniency from the Court.

## Conclusion

For these reasons, the government respectfully requests that the Court sentence the defendant within the applicable Guidelines range of 30-37 months' imprisonment, require a term of

supervised release with the special conditions listed in the PSR, and impose forfeiture together with all required monetary assessments.

                              Respectfully submitted,

                              Jaime Esparza
                              United States Attorney

By:   */s/ G. Karthik Srinivasan*
        G. Karthik Srinivasan
        Assistant United States Attorney
        903 San Jacinto, Suite 334
        Austin, Texas 78701
        (512) 916-5858 (phone)
        (512) 916-5854 (fax)
        Karthik.Srinivasan@usdoj.gov

## Certificate of Service

I certify that on March 11, 2024, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will serve the following participants:

Russ Hunt, Esq. and Jason Trumpler, Esq., counsel for defendant

*/s/ G. Karthik Srinivasan*
G. Karthik Srinivasan
Assistant United States Attorney